UNITED STATES DISTRICT COURT        <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
EUNICE KIPPINS,

                Plaintiff,

    -against-                        **MEMORANDUM & ORDER**
                                      19-CV-3120 (JMA)(ARL)
AMR CARE GROUP, INC. and JILL SMITH,
INDIVIDUALLY,

                Defendants.
-------------------------------------------------------------X
**AZRACK, District Judge:**

FILED
CLERK
10:45 am, Sep 11, 2023
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

       Plaintiff Eunice Kippins ("Plaintiff") commenced this action against AMR Care Group Inc. ("AMR") and Jill Smith ("Smith") (together "Defendants") asserting claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"). Presently before the Court is Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted as to Plaintiff's federal claims under Title VII.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## I.  BACKGROUND

### A.  <u>AMR and its Business</u>

       AMR was a care management and companion service company that provided services to aging and physically challenged populations. (Pl.'s Opp. to Defs.' 56.1 Statement ("Pl. 56.1") ¶¶ 1–3.)  AMR ceased its operations in January 2020.  (Pl. 56.1 ¶ 1.)

As part of its services, AMR placed Companions in homes to assist with AMR's clients' needs. (*Id.*) Smith was AMR's Director of Companion Services and Companion Care Coordinator from 2011 through 2020 and, as such, was responsible for, among other things, scheduling, hiring, onboarding, interviewing, training, coordinating and supervising companions. (*Id.* ¶¶ 2–3.)

The duties and responsibilities of a Companion were to assist AMR's clients with daily living activities at the client's home, such as light housekeeping and meal preparation. (*Id.* ¶ 5.) There was no hands-on care of the patient, only supervision, medication reminders, and socialization. (*Id.*)

## B. **Plaintiff's Employment at AMR**

Plaintiff, who is African American, applied to AMR online and was interviewed by Smith. (Pl. Dep. 33.) Plaintiff was ultimately hired by Smith to work as a Companion for AMR. (Pl. Dep. 35, 133; Pl. 56.1 ¶ 4.) Plaintiff's pay rate was set by AMR and she was paid by AMR. (Pl. Dep. 177; Pl. 56.1 ¶ 26.)

Smith assigned Plaintiff to work as a caregiver for a 94-year-old woman named Mai Plotkin ("Mai"), who suffered from mental and physical ailments. (Pl. Dep. 36–37; Smith Decl. ¶ 19.) Mai was the only individual Plaintiff cared for during her employment with AMR. (Pl. Dep. 36, 43.)

AMR was hired to provide home healthcare services for Mai by her two children, who were Mai's healthcare proxies. (Pl. 56.1 ¶ 20.) Both of Mai's children lived out of state. (*Id.*) Mai also had a substitute healthcare proxy named Kathy Waters ("Waters"), who would step in during the children's absence. (*Id.* ¶¶ 19-21.)

According to Plaintiff, Waters was "the fiduciary of [Mai's] estate" and "was charged by [Mai's] estate to pay all expenses as it related to the care of [Mai]." (Pl. Aff. ¶¶ 21–22.) Waters was not an employee of AMR. (Pl. 56.1 ¶ 23.)

Prior to April/May 2017, AMR had also provided—along with Companion services—nurse services, a care manager, and a social worker to assist Mai. (Pl. Dep. 170.) In April/May 2017, Waters and Mai's children suspended all these additional services and only continued to use AMR's Companions. (Pl. Dep. 154–55, 170.)

Plaintiff was initially employed by AMR part-time and worked day shifts on the weekends. (Pl. Dep. 37.) At some point, Smith asked Plaintiff if she would work full time on the night shift, which Plaintiff accepted. (Pl. Dep. 37.) When Plaintiff arrived at Mai's house and left, she would clock in and out, on AMR's time clock, by calling a phone number. (Pl. Dep. 38, 159.) If Plaintiff ever had to swap schedules with another AMR caregiver, she would advise Smith. (Pl. Dep. 39.)

Plaintiff testified that she considered both Smith and Waters to be her "supervisors." (Pl. Dep. 39, 135.) As discussed infra, Plaintiff was eventually terminated on August 3, 2017 and seeks to hold Defendants liable for alleged discriminatory and retaliatory actions by Waters that purportedly led to Plaintiff's termination. The parties contest Waters' role and Defendants' liability for Waters' conduct. Plaintiff asserts that various actions and statements by Waters and Smith support her claim that Waters acted as her supervisor to a degree that could render Defendants liable for Waters' conduct. As explained below, a close examination of

the record and Plaintiff's deposition undercuts many of these allegations and her broader claim that Waters was her "supervisor."

## C. Waters' Alleged Involvement with Plaintiff's Employment

### 1. Schedule

When Plaintiff was asked about the hours that AMR set for her to work, Plaintiff testified that she "understood" that both "AMR and Kathy Waters. . . set the schedule." (Pl. Dep. 42; <u>see</u> Pl. Aff. ¶ 34)   However, Plaintiff subsequently admitted at her deposition that Waters did not determine when Plaintiff was supposed to work. (Pl. Dep. 42.)   Plaintiff admitted that Smith told Plaintiff when her shifts would be and set the times for those shifts.  (Pl. Dep. 134, 177.)

### 2. The Logbook/Schedule of Duties

At Mai's house, there was a weekly logbook that listed specific tasks that each of the Companions were supposed to do on their particular shift.  (Pl. Dep. 40–41; Pl. Ex. J.)  For example, according to one weekly logbook, on Monday and Wednesday, Plaintiff was supposed clean the kitchen, give Mai her medication reminder, and walk the dog.  (Pl. Ex. J.)  On that Wednesday, Plaintiff was also supposed to do the laundry.  (*Id.*)  The Companions were supposed to check off that they completed the tasks assigned to them.  (*Id.*)

Plaintiff admits that the duties she had to perform for Mai were part of the job responsibilities of the AMR Companions.  (Pl. Dep. 41, 43; *see also* Smith Decl., Ex. Exs. H, I.)

At one point during her deposition, Plaintiff stated that Waters set the "schedules in terms of duties" and that Waters "kind of put [the logbook] in motion." (Pl. Dep. 139–40; *see also* 134.)  However, Plaintiff later clarified that she actually did not know who initially created the logbook or who typed it out each week.  At her deposition, Plaintiff explained that before the logbook was created, she was the only caregiver who would write down what she had done during her shift.  (Pl. Dep. 213.)  *Smith* then asked Plaintiff for her "documents" and then "they had a logbook for the staff to follow."  (Pl. Dep. 213.)  Plaintiff admitted that she had no idea who initially created the logbook or who typed up the logbook each week.  (Pl. Dep. 212, 214.)

At her deposition, Plaintiff also admitted that she did not know what "led" to the introduction of the logbook and speculated that other caregivers had concerns about the work being "evenly spread out" and that "maybe somebody might have complained."  (Pl. Dep. 143.)  Plaintiff also admitted that the purpose of the logbook was to ensure that the necessary tasks had been completed and that "everybody would be on the same page."  (Pl. Dep. 144.)

Given the evidence above, a reasonable jury could not find that Waters created the initial logbook or determined its contents each week.[1]

In her complaint and in her affidavit submitted in opposition to summary judgment, Plaintiff also asserts, in conclusory fashion, that "AMR gave Ms. Waters

---

[1]  In the affidavit Plaintiff submitted in opposition to Defendants' summary judgment motion, Plaintiff asserts that Waters "created a schedule for my daily duties."  (Pl. Aff. ¶ 28.)  However, this and other assertions in her affidavit are contradicted by Plaintiff's deposition testimony and, as such, do not create a genuine issue of fact.  *See Brown v. Reinauer Transportation Companies, L.P.*, 788 F. App'x 47, 49 (2d Cir. 2019) ("It is well settled that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'"  (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996))).

authority to enforce a work schedule for me." (Pl. Aff. ¶ 33.) However, when asked about this allegation at her deposition, Plaintiff vaguely responded that Smith "gave [Waters] the authority to delegate, you know, things to us and she did." (Pl. Dep. 184.) At her deposition, Plaintiff also testified that Waters would "look in the logbook" and would "supervise to see what was done and how Mai was doing." (Pl. Dep. 214.) It is not surprising that Waters—who was acting on behalf of Mai—would check on how Mai was doing and would check to ensure that Mai was receiving the services Mai and her children were paying AMR to provide.

### 3. Water's Alleged Suspension of AMR Employees

Plaintiff alleges that Waters "suspended" AMR's nurse and other AMR employees. (Pl. Dep. 64.) However, Plaintiff's deposition makes clear that Waters and Mai's children simply decided to stop receiving certain "services" from AMR. (Pl. Dep. 154.) As explained below, the record does not indicate that Waters had the ability to "suspend" AMR employees as one would normally use that term.

As noted earlier, prior to April/May 2017, AMR had also provided—along with Companion services—nurse services, a care manager, and a social worker to assist Mai. (Pl. Dep. 170.) In April/May 2017, Waters and Mai's children suspended all these additional services and only continued to use AMR's Companions. (Pl. Dep. 154–55, 170.)

Obviously, Waters and Mai's children had the right to discontinue receiving (and paying for) certain services from AMR. At Plaintiff's deposition, she admitted that "suspension" of these additional services occurred because Waters and Mai's

children believed that "AMR was overcharging for services that were not rendered." (Pl. Dep. 153-54; *see also* Pl. Dep. 156 (testimony that Mai's daughter told Waters that "she was being charged for services that weren't rendered").)

Plaintiff's knowledge about Waters' role in the suspension of these services was based on that fact that Waters told Plaintiff that "she suspended AMR's *services*, all their other *services* with the exception of the caregivers." (Pl. Dep. 155 (emphasis added); *see also* Pl. Dep. 154 (Waters told Plaintiff that "she's in charge and she has suspended AMR *services*") (emphasis added).) At her deposition, Plaintiff admitted that Waters suspended certain "services," not the "staff." (Pl. Dep. 162, 168.)

The evidence above makes clear that Waters did not "suspend" any employees as that term is ordinarily used. Rather, Waters and Mai's children simply decided to stop receiving certain "services" from AMR. (Pl. Dep. 154.)

### 4. The Side Jobs

According to Plaintiff, Waters would offer "side assignments outside of AMR" to the caregivers, such as extra cleaning, medication for the dog, and snow shoveling. (Pl. Dep. 40.) Waters asked Plaintiff, at one point, to take on the additional tasks of "scheduling and planning activities for all shifts for the caregivers," but Plaintiff declined this additional work.[2] (Pl. Dep. 40.) At one point, Waters also asked Plaintiff if she could work extra days and Plaintiff told her that she could not. (Pl. Dep. 41.)

---

[2] Prior to April/May 2017, Mai's children paid AMR for the services of an employee named "Lori," who was supposed to research activities for Mai. (Pl. Dep. 154–55, 160–61, 169–170.) Plaintiff, however, would look in the Sunday paper on her own to find activities for Mai; to Plaintiff's knowledge, no one else actually performed any such research. (Pl. Dep. 154–55.) This appears to have led to the decision by Waters and Mai's children to discontinue use of Lori's services. (Pl. Dep. 154–55.)

These additional days and tasks were offered to Plaintiff, but they were not mandatory and she faced no repercussions from Waters for turning them down. (Pl. Dep. 40.)

Plaintiff testified that she "think[s]" she told Smith that Waters offered her extra duties for pay on the side. (Pl. Dep. 179.) However, Plaintiff knew that this was against AMR's policy and, as such, she did not accept Waters' offer. Plaintiff also testified that she mentioned to "them" that Waters was "offering the caregivers extra payments for services." (Pl. Dep. 179.) Plaintiff, however, did not testify that she informed Smith or anyone else at AMR that any caregivers had actually <u>accepted</u> these offers and Plaintiff made clear that she, herself, had rejected Waters' offer. As such, there is no evidence that AMR was aware that any caregivers were accepting payments from Waters to perform additional services. (Pl. Dep. 179.)

In her affidavit submitted in opposition to summary judgment, Plaintiff asserts, confusingly, that "Defendant AMR knew and Ms. Waters did, provide Defendant AMR's caregivers cash payments for additional services." (Pl. Aff. ¶ 30.) Plaintiff's affidavit does not identify which caregivers allegedly accepted Waters' offers or what specific services they allegedly performed. Nor does Plaintiff's affidavit state that she relayed such information to any specific employee at AMR. In any event, it is undisputed that Waters never paid Plaintiff separately for any additional services.

### 5. Smith's Alleged Statements About Waters' Role

After Waters suspended certain AMR services in April/May 2017, Waters took over the tasks that had been performed by the AMR nurse, care manager, and social worker/research coordinator.  As a result of this change, Smith told Plaintiff that "Waters is in charge of [Mai's] care, and that she will be take caring of the meds and all of the other related things that other people from [AMR] used to take care of."  (Pl. Dep. 160, 162.)

Plaintiff alleges, in her complaint and in her affidavit opposing summary judgment, that, when Waters suspended these services in April/May 2017 and took over the tasks, Smith directed Plaintiff to report "all concerns and complaints to Waters."  (Am. Compl. ¶ 37; Pl. Aff. ¶ 23; Pl. Dep. 159–160.)

However, when asked at her deposition what actual words Smith used, Plaintiff testified that Smith said, "Kathy Waters is in charge of *Mai's care*."[3]  (Pl. Dep. 162 (emphasis added).)  At another point during her deposition, Plaintiff testified that Smith told her to "report all of *Mai's concerns*, *health concerns*, to Ms. Waters."  (Pl. Dep. 165 (emphasis added); *see also* Pl. Dep. 174 (testimony that Plaintiff would relay Mai's "health concerns" to Waters).)  These directives are unsurprising as Waters was Mai's health care proxy and had taken over the tasks previously performed by the nurse and care manager.  They do not, however, indicate that Waters was Plaintiff's supervisor.

---

[3]  Given this deposition testimony, Plaintiff's statement in her affidavit that Smith told her to report "all concerns and complaints to Waters," (Pl. Aff. ¶ 36), does not create an issue of fact.  In any event, even assuming that Smith did, in fact, tell Plaintiff to report "all concerns and complaints" to Waters, Defendants would, given all the evidence above, still be entitled to summary judgment.

Plaintiff admits that, despite Smith's alleged directives concerning reports to Waters, Smith never told Plaintiff to stop reporting issues to Smith.  (Pl. Dep. 165–66.)  In fact, even after Smith gave Plaintiff her alleged directive in April/May 2017, Plaintiff continued to report any complaints and concerns to Smith.  (Pl. Dep. 165–66, 173, 182.)

### 6. Other Aspects of Waters' Alleged Supervisory Role

Plaintiff testified that she considered Waters was her "supervisor" and that she "report[ed] to" Waters.  (Tr. 39, 51, 138.)  When asked, at her deposition, why she considered Waters to be her "supervisor," Plaintiff explained:

> A:  She basically scheduled our duties and she came to inform us of things to do.  She came to repair or meet various people at the house to do various things and she would instruct what she would like to have done.
>
> Q:  What type of duties did she schedule?
>
> A: She scheduled, basically, chores so that it would be even across the board of the caregivers. She offered -- she would come and offer side assignments outside of AMR.
>
> Q:  Like what?
>
> A:  Extra cleaning, medication for the dog, applying the Epipen [to the dog], snow shoveling, and she requested me to take on scheduling and planning activities for all shifts for the caregivers.
>
> ****
> A:  Kathy Waters also would communicate a schedule in terms of the days that I would come in or ask me if I wanted to work extra days as well.

(Pl. Dep. 39–40; *see also* Pl. Dep. 139–40 (Plaintiff's testimony that Waters supervised her because she "kind of put [the logbook] in motion").).)  When asked how

Waters "supervise[d]" her employment, Plaintiff responded, "She checked behind us. If we had questions, and she delegated extra jobs if we were interested to make extra cash."  (Pl. Dep. 140.)

Plaintiff's testimony above focuses on the logbook (i.e. the "schedule") of duties as well as the side jobs offered by Waters.  The Court has already addressed Plaintiff's testimony on these points in depth and neither point supports Plaintiff's claim that Waters was her supervisor.  Nor does Plaintiff's testimony that Waters "came to repair or meet various people at the house to do various things." (Pl. Dep. 40.)

Plaintiff also initially testified that Waters would "communicate a schedule in terms of the days that I would come in." (Pl. Dep. 41–42.)  However, as explained earlier, Plaintiff subsequently clarified that Smith determined when Plaintiff worked.  (Pl. Dep. 134, 177.)

Other testimony from Plaintiff's deposition about Waters also does not support her claim that AMR ceded supervisory authority to Waters.  When Plaintiff was asked, at her deposition, to explain how Waters was her "day to day" supervisor, Plaintiff testified that if there was a flood in the basement, she would inform Waters that she was going to clean it up and then Waters would come over and see where the problem started.  (Pl. Dep. 181.)  Waters would come to the house "sporadically."  (Pl. Dep. 185.).

Plaintiff also testified that Waters would:

> just come to see that things were done, that [Mai] had her meds, the
> garbage was taken out, the house was tidy. A lot of times I had to
> troubleshoot the TV, cable. She would make sure her TV is working,
> and if she couldn't do, she would ask me to do it because I had a friend
> that worked at cable, Verizon. They would walk me through many times
> of troubleshooting Mai's TV. And Kathy Waters would be pretty much
> hands-on because that was a form of entertainment for [Mai].

(Pl. Dep. 183.)

As discussed *infra*, one potentially relevant factor in determining AMR's
potential liability is the control, if any, that AMR exercised over Waters. There is,
however, no evidence that AMR controlled Waters. In fact, when asked if AMR
controlled Waters, Plaintiff admitted that AMR did not control Waters' actions or
behavior "at all." (Pl. Dep. 187.)

The record also contains evidence of two notable instances where AMR made
clear to Waters that the Companions were AMR's employees and were under AMR's
control. In a February 24, 2017 email exchange between Waters and AMR's owner
Anne Recht, Recht told Waters that she should raise issues with Smith and that
Waters could not tell Annette, another AMR Companion, not to speak to Smith about
an issue as "Annette is our employee and reports to [Smith]." (Smith Decl., Ex. M.)
This email also indicates that Smith, in her role as the Companions' supervisor, had
instructed the Companions to record where they go each day in order address Waters'
apparent concerns about discrepancies concerning "mileage" charges. (*Id.*)

In another email exchange dated July 26, 2018, Waters attempted to direct
Smith to schedule a specific Companion named Judy for two particular days. (Smith

Decl., Ex. N.)  Smith responded that Judy was not available and that Smith should be contacted before Waters contacts the Companions.  (*Id.*)  Recht then stressed to Waters again that the Companions are AMR's employees and Smith makes their schedules.  (*Id.*)

### D. Events Surrounding Plaintiff's Termination

As discussed below, Defendants maintain that Plaintiff was ultimately terminated for improperly handling and providing new medication to Mai.

Since Plaintiff worked the night shift, most of the time, Mai had already taken all her medication for the day.  (Pl. Dep. 47.)  However, on some occasions when Mai had not, for whatever reason, taken her medication Plaintiff would give it to her by pouring it out of Mai's pre-dispended pill box onto a napkin.  (Pl. Dep. 48.)

AMR's written Companion Position Description and Companion Policies and Procedures state that Companions were not to handle or touch any of the clients' medications directly, nor were they to feed clients the medications.  The Companion Position Description further states that:  "A Companion cannot provide any hands-on personal care to a client. Personal care means assistance with the activities of daily living, such as . . . administrating medication. However, they can supervise these activities."  (Pl. 56.1 ¶14.)  AMR's Policies and Procedures also stated that companions are not to administer medicine, but only provide "Medication Reminders" as set forth under "Role of Companion."  (Pl. 56.1 ¶ 16.)  Although not addressed in AMR's written policies. Smith admitted at her deposition that were allowed to

supervise the client's ingestion of medication by pouring the medication from the client's pre-dispended pill box onto a napkin.

### 1.  The Events of July 31, 2017 and August 1, 2017

On July 31, 2017, Plaintiff observed that Mai was not hungry and, by the morning of August 1, was weaker.  (Pl. Dep. 71–72.)  Plaintiff then called Smith to tell her that Mai was not doing well and suggested that someone take her to the doctor.  (Pl. Dep. 72.)  Smith then told Plaintiff over the phone to relay this information to Waters.[4]  (Pl. Dep. 72; *see* Pl. Aff. ¶ 37 & Pl. Dep. 188 (testimony that Smith told Plaintiff that "She is not responsible, and that Plaintiff should forward all her concerns to [Waters]").[5]

Plaintiff then called Waters and told her about Mai's condition and the fact that there was no food in the house.  (Pl. Dep. 73.)  Waters said she would look into it and see if she could get Mai an appointment with the doctor.  (Pl. Dep. 73–74.)  Waters then texted Plaintiff multiples times about Mai's condition and the lack of food.  (Pl. Dep. 74.)  At some point later that day, Waters informed Plaintiff that she had taken Mai to the doctor.  (Pl. Dep. 74.)  Waters also informed Plaintiff that Mai would be

---

[4]  Plaintiff attempts to make much out of this directive.  However, it is not surprising that Smith would direct Plaintiff—who had just seen Mai in person—to contact Waters rather than have Smith relay Plaintiff's account of Mai's condition to Waters.

[5]  At her deposition, Plaintiff was questioned about contemporaneous text messages she exchanged with Smith about this incident.  (Pl. Dep. 188.)  In the text messages, Plaintiff informed Smith that Mai's condition had not improved since the last time Plaintiff had seen her.  (Pl. Dep. 188.)  Smith then directed Plaintiff to let Waters know that Mai's condition was not improving.  (Pl. Dep. 189.)  Plaintiff then responded to Smith that Waters must know already because Waters had been at the house over the weekend to do Mai's medication.  (Pl. Dep. 189.)  Smith then responded that Plaintiff should still let Waters know.  (Pl. Dep. 190.)

getting new medication, a fact that Plaintiff then relayed to Smith.  (Pl. Dep. 191–92; Pl. Aff. ¶ 41.)

On the morning of August 1, 2017—in line with prior reminder emails and AMR's written policies—Smith sent an email and text message to all companions, including Plaintiff, reminding them that:

> You are NOT allowed to TOUCH any medications.  You are only allowed to REMIND the client to take the medicine.  If the medicine is pre-poured in a weekly medicine dispenser, you can open the dispenser and instruct the client to take the medicine.  THAT IS IT.  If you have any questions, please let me know.

(Pl. 56.1 ¶ 40; *see* Smith Decl., Exs. H, I.)  Plaintiff admits that she received this email that morning, before her next shift began on the evening of August 1, 2017.  (Pl. 56.1 ¶¶ 40–42, Pl. Dep. 57, 61.)

When Plaintiff arrived at Mai's house for her shift on the evening of August 1, 2017, Mai and the daytime caregiver, Annette, were engaged in an argument.  (Pl. Dep. 75–76.)  While Plaintiff was waiting outside, she received a call from Laura Giunta, another AMR employee.[6]  (Pl. Dep. 76.)

As discussed <u>infra</u>, Plaintiff and Giunta have relayed conflicting accounts of this phone call.  The version set out immediately below is Plaintiff's account from her deposition.  Giunta's version of events is addressed later.

Annette had just gone grocery shopping and picked up medication from CVS. (Pl. Dep. 78.)  Inside Mai's house, Plaintiff saw two CVS prescription bags on the kitchen table and informed Giunta.  (Pl. Dep. 49, 79.)  Giunta then told Plaintiff to

---

[6]  Giunta had some supervisory duties when she was on-call on and manning AMR's emergency phone line.  (Smith Dep. 28.).

open one of the bags and read her the name of the prescription.  (Pl. Dep. 49–50, 82.)
Giunta told Plaintiff that Mai had not eaten and that Plaintiff should prepare a full
meal for her and give her "two pills of her new medication that evening."  (Pl. Dep.
75; *see also* Pl. Dep. 49–50, 82.)  Plaintiff subsequently peeled off two foil pills and
put them on a napkin for Mai, who took the medication.  (Pl. Dep. 82, 96.)

Plaintiff admits that this new medication had not been opened and had not
been pre-dispensed into Mai's pill box.  (Pl. Dep. 50.)

At some point on August 1, 2017, Plaintiff notified Waters about Smith's email
concerning the limitations that AMR placed on the Companions' involvement with
medication.  (Pl. Aff. ¶ 55.)  After seeing Smith's email, Waters accused Plaintiff of
complaining to Smith.  (Pl. Aff. ¶ 56.)  This email allegedly made Waters upset so that
she called Plaintiff a "smart nigger."  (Pl. 56.1 ¶ 43.)  Plaintiff then said to Waters,
"this conversation is over."  (Pl. Dep. 199.)

At 11:37 PM on August 1, Waters emailed Smith the following message:

I am extremely upset with [Plaintiff's] behavior tonight.  I was trying
to communicate the information that I felt she needed to know about
[Mai] and she was beyond rude and totally disinterested.  I asked her
five times to please stop talking and listen and she refused.  I really felt
that I was dealing with a mentally unstable person and am not
comfortable with having her take care of [Mai] any longer.

Do you have someone that can take her place? We do not want her back
in the house.

(Pl. 56.1 ¶ 56; Smith Decl. Ex. L.)

### 2. Events of August 2, 2017 and August 3, 2017

On August 2, 2017, Smith emailed and texted Plaintiff to call her as soon as possible and instructed Plaintiff that she was "NOT to go to Mai tonight. (Smith Decl., Ex. J.) Plaintiff does not dispute that she received this message. (*See* also Pl. Dep. 202 ("[Smith] asked me not to come in that evening.").) As Smith explains in her declaration—which is not contradicted on these points—prior to sending this message: (1) Waters had notified Giunta that Plaintiff had directly administered medication by hand to Mai; and (2) Giunta had, in turn, notified Smith about this improper administration of medication. (Smith Decl. ¶¶ 23–24.) According to Smith, Plaintiff's actions violated AMR's policies. (*Id.*)

Plaintiff and Smith then spoke at some point during the morning of August 2, 2017. (Pl. Aff. ¶ 60; Pl. Dep. 113; Smith Decl. ¶ 30.) During this phone call, two relevant exchanges took place.

Smith discussed Plaintiff's administration of medication to Mai and Plaintiff admitted that she had, in fact, administered and dispensed the new medication to Mai. (Smith Decl. ¶¶ 25–26; Smith Dep. 31; *see also* Pl. Dep. 87–88.) During this phone call, Smith told Plaintiff that she would have to "let [Plaintiff] go" because she "gave meds to Mai" in violation of "AMR's policy." (Pl. Dep. 87–88, 207-08; *see* Smith Decl. ¶ 30.) Plaintiff then tried to explain to Smith that she had been following Giunta's instructions. (Pl. Dep. 87–88.) According to Plaintiff, Smith was not aware of Giunta's conversation with Plaintiff. Smith then told Plaintiff that that she "would look into it" with Giunta. (Pl. Dep. 87–88, 113, 202.)

During this call, Plaintiff also complained to Smith about Waters' racial slur.[7] (Pl. Dep. 87–88, 198–200.)  Smith denies that Waters made this complaint.  (Smith Dep. 30.)

After this phone call, Plaintiff sent Smith a text message reiterating that Giunta had instructed Plaintiff to open up Mai's "new" medication and to give her two tablets.  (Smith Decl., Ex. K.)

After Smith's call with Plaintiff, Smith contacted Giunta, who informed Smith that she did not direct Plaintiff to dispense and administer new medication to Mai, as Plaintiff had alleged.  (Smith Decl, ¶¶ 40–41; Smith Dep. 32; *see also* Pl. 56.1 ¶¶ 52–54.)  Rather, Giunta informed Smith that she had told Plaintiff to administer other pills that had already been put out for Mai—namely, pills that had been put out by Annette, the Companion who worked the day shift.  (Smith Dep. 32.)  Smith also contacted Annette, who told Smith that she had left nighttime pills *from Mai's pillbox* on the table, which Plaintiff was supposed to give to Mai.  (Smith Dep. 32– 33.).  Annette's statements corroborated Giunta's version of events.

Plaintiff did not depose either Giunta or Annette.  No evidence in the record contradicts Smith's testimony concerning her communications with Giunta and Annette.  In fact, a subsequent text exchange between Plaintiff and Giunta discussed below shows that Giunta has consistently maintained, contrary to Plaintiff's account of events, that she did not tell Plaintiff to give Mai new medication.

---

[7]  Plaintiff's deposition testimony and affidavit do not state that, during this call, Plaintiff complained to Smith *before* Smith told Plaintiff that she had violated AMR's policies concerning the administration of medication and that, as such, Smith would have to "let [her] go."

At 11:45 a.m on August 2, 2017, Smith sent an email to Recht stating that she was terminating Plaintiff.  It is not clear whether this email was sent before or after the earlier phone call between Plaintiff and Smith discussed above, which Plaintiff asserts occurred in the "morning."  (Pl. Aff. ¶ 60.)

According to Plaintiff, she was ultimately terminated on August 3, 2017.  (Pl. Aff. ¶ 65.)

Smith maintains that she terminated Plaintiff for improperly dispensing new medication that was not from Mai's pre-dispensed pillbox.  (Smith Decl. 38–39; Dep. 31–32.)

At some point—apparently on August 3, 2017—Plaintiff and Giunta exchanged of a series of text messages.  In this exchange, Giunta disputed Plaintiff's version of events and insisted that she had told Plaintiff to "give [Mai] the two tablets which were out on the table and to put all other meds to the side for Kathy Waters" so that she could "fill the pill box."  (Decl. of Yale Pollack, Ex. F.)  Giunta also maintained that Plaintiff was "never told nor did you ask or mention opening anything."  (*Id.*)

Plaintiff suggests that her actions did not violate AMR's policies because she did not feed Mai any medication by hand.  As noted earlier, at her deposition, Smith admitted that Companions may pour medication from the pre-dispensed pillbox onto a napkin for the client.  (Smith Dep. 25.)  Smith, however, does not assert that she terminated Plaintiff simply because she put Mai's medication onto a napkin.  Rather, Smith maintains that Plaintiff was terminated because she gave new medication to Mai that had not been previously dispensed into Mai's pillbox by Waters.  (Smith Dep.

31–32.)  Moreover, Plaintiff admittedly handled this medication when she peeled off two foil pills.  (Pl. Dep. 96.)  This handling was not the same as pouring pills from a pre-dispensed pill box.

Plaintiff knew that Mai was supposed to receive her medication from the pill box.  (Pl. Dep. 46.)  Plaintiff also admits that it was not her job to fill the pre-dispensed pill box and that only the nurse or Kathy Waters were supposed to the pill box.[8]  (Pl. Dep. 53–54.)  Plaintiff's defense of her conduct on August 1, 2017 relies on her claim that Giunta instructed her to give Mai the new medication—a claim that Giunta disputed when she was questioned by Smith.

## II. DISCUSSION

### A.  Applicable Standard – Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff*

---

[8]  As mentioned previously, at some point prior to August 2017, Waters had discontinued nurse services from AMR and then began filling the pill box herself.  (Pl. Dep. 62–63.)

*v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004). In deciding the motion, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp.

3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party.").

In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-CV-427, 2012 WL 4380921, at *6, n. 10 (N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment.").

## B. <u>The Discrimination Claim</u>

### 1.     Applicable Standard

Title VII claims are analyzed in accordance with the three-step analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) and its progeny. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–10 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–54 (1981).

Under this framework: (1) a plaintiff must establish a prima facie case of discrimination; (2) after the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action; and (3) if the employer articulates such a reason, the burden then shifts back to plaintiff to prove, by a preponderance of evidence, that the employer's stated reason is merely pretextual and that discrimination was the actual reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802–805; *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–492 (2d Cir. 2010); *Russell v. Cnty. of Nassau*, 696 F. Supp. 2d 213, 231 (E.D.N.Y. 2010). "Evidence of pretext, however, even combined with the minimal showing necessary to establish a prima facie case . . . does not mandate a denial of summary judgment." *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 103 (2d Cir. 2001) (citation omitted). Rather, the court "examine[s] the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Id.* at 101 (*quoting Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted).

To establish a prima facie case of race discrimination under Title VII, the plaintiff must show that: (1) he belonged to a protected class or protected age group; (2) was qualified for the position he held; (3) plaintiff suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 11 (2d Cir. 2013); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F. 3d 456, 466 (2d Cir. 2001).

For race discrimination claims, plaintiff must ultimately prove that his race was a motivating factor behind the adverse action, *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  Discriminatory intent underlying a decision may be inferred from the totality of the circumstances, including historical background, sequence of events, and contemporary statements. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002), *superseded by statute on other grounds.*

However, "conclusory allegations of discrimination, absent any concrete particulars, are insufficient." *Cameron v. Cmty. Aid For Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir. 2003) (internal quotation mark omitted).

At the third stage of the *McDonnell Douglas* analysis, "the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff." *Slattery*, 248 F.3d at 91. "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original). If plaintiff fails to "show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). A plaintiff's disagreement with his employer's assessments does not prove that defendant's stated reason was pretextual. *Del Franco v. New York City Off-Track Betting Corp*., 429 F. Supp. 2d 529, 539 (E.D.N.Y. 2006) *aff'd*, 245 F. App'x 42 (2d Cir. 2007). Trial courts scrutinize an employer's decision to determine if discrimination occurred—they do "not sit as a super-personnel department that reexamines an entity's business decisions." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014).

The Second Circuit has held in "the Title VII context that the conduct of certain nonemployees may be imputed to [an] employer where (1) the employer exercises a high degree of control over the behavior of the non-employee, and (2) the employer's

'own negligence' permits or facilitates that non-employee's discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38–39 (2d Cir. 2019) (internal quotation marks omitted).

### 2.   Analysis

Plaintiff admits that Smith did not harbor any discriminatory animus.  (Pl. Mem. at 6.)  Instead, Plaintiff argues that an inference of discrimination arises from Waters' statement that Plaintiff was a "smart nigger," Waters' written request that Plaintiff be removed as a companion to Mai, and Plaintiff's subsequent termination. Plaintiff maintains that Waters' request was motivated by Plaintiff's race.

Plaintiff appears to rely on a "Cat's Paw" theory of liability in an attempt to hold AMR liable for Water's alleged discriminatory conduct.  However, in order to impute a non-employee's alleged discriminatory intent to a defendant employer under a Cat's Paw theory, a plaintiff is generally must establish that the employer exercised a "high degree of control over" the non-employee.  *Menaker*, 935 F.3d at 38–39 (applying this standard to Cat's Paw claim involving student-athlete); *cf. Leroy v. Delta Air Lines,* No. 21-267-CV, 2022 WL 12144507, at *4 (2d Cir. Oct. 27, 2022) (indicating that same standard applied to hostile work environment claim where customer of airline allegedly made racist remark to flight attendant).

Here, a reasonable jury could not conclude that AMR exercised a high degree of control over Waters.  There is no evidence that AMR controlled Waters, who was acting on behalf of Mai, AMR's client and customer.

Plaintiff does not address *Menaker*.  In fact, Plaintiff's opposition brief does not articulate any legal theory or cite to any relevant authority as to why Defendants should be liable for the alleged discriminatory conduct of Waters, who was not an AMR employee.  Plaintiff simply asserts that Waters "was actually put in charge of Plaintiff's day to day activities by Defendants," (Pl. Mem. at 6), and cites three cases for the proposition that "when the ultimate decisionmaker has no record of discriminatory animus, a plaintiff may prove discrimination based on evidence that an "individual shown to have [an] impermissible bias played a meaningful role in the . . . process." *Kenchi v. Hanesbrands Inc.*, No. 10 CIV. 1662 PKC, 2011 WL 4343418, at *5 (S.D.N.Y. Aug. 12, 2011) (quoting *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999) and citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 126 (2d Cir. 2004).  However, in each of these cases, the individual who harbored impermissible bias was indisputably an employee of the defendant employer.  These Cat's Paw cases say nothing about when an employer may be liable if the allegedly biased individual is not an employee of the defendant.

Given the arguments that Plaintiff has advanced, her discrimination claim fails as she has not articulated any basis to hold AMR liable for Waters' alleged

discrimination.[9]

Moreover, the Court rejects Plaintiff's Cat's Paw argument based on the Tenth Circuit's persuasive decision in *Armstrong v. The Arcanum Grp., Inc.*, 897 F.3d 1283, 1290–91 (10th Cir. 2018). In *Armstrong*, defendant Arcanum was a placement agency that employed the plaintiff and placed her in an assignment at the Bureau of Land Management ("BLM"). After the plaintiff engaged in protected activity, BLM employees demanded that she be removed from her placement. Arcanum complied with this request and, after finding no other open positions that were suitable for the plaintiff, terminated the plaintiff's employment with Arcanum. The Tenth Circuit rejected Plaintiff's claim that Arcanum was liable for retaliation based on a Cat's Paw theory. The court concluded that, even if the BLM employees could be considered the plaintiff's supervisors, Arcanum could not be held liable under a Cat's Paw theory

---

[9] At the motion to dismiss stage, Magistrate Judge Lindsay's January 22, 2021 Report and Recommendation ("the R&R")—which was subsequently adopted by the Court—found that Plaintiff had "alleged just enough" to survive a motion dismiss. *Kippins v. AMR Care Grp., Inc.*, No. 19-CV-3120, 2021 WL 4683582021 WL 468358, at *4 (E.D.N.Y. Jan. 22, 2021), *report and recommendation adopted*, 2021 WL 466017 (E.D.N.Y. Feb. 9, 2021). The R&R raised the prospect that AMR might be liable for Waters' conduct because AMR allegedly gave "Waters full authority to call the shots" and Waters could potentially qualify as an "an AMR supervisor" or "co-employer." *Id.* *4–5. The R&R found that Plaintiff had "alleged just enough to leave open the possibility that AMR facilitated the discrimination by giving Waters both hiring, supervisory and even firing authority over Kippins and other AMR employees as it concerned [Mai]." *Id.* at *4.

Plaintiff has waived any arguments based on the R&R given her complete failure to even mention the R&R in her opposition brief. In any event, the reasoning of the R&R—which was decided under the standard applicable to motions to dismiss—does not indicate that summary judgment should be denied here. Many of the factual allegations from Plaintiff's Amended Complaint that the R&R relied on in denying Defendants' motion to dismiss have not been borne out by the evidence. The full record here, set out above, belies Plaintiff's allegations that AMR ceded supervisory authority and the authority to hire and fire to Waters.

The Court notes that although the R&R referenced the possibility that AMR might be liable under a "co-employer" theory, Plaintiff's opposition brief does not raise a "co-employer" or "joint employer" theory or cite any caselaw concerning such a theory. Accordingly, Plaintiff has abandoned and waived any such arguments.

because the BLM employees were not agents of Arcanum. *Id.* at 1291. Under the persuasive logic of *Armstrong*, Waters—like the BLM employees—was not an agent of AMR and, thus, AMR would not be liable under Cat's Paw theory even if, as Plaintiff claims: (1) Waters could be considered her supervisor; and (2) Waters, acting with discriminatory intent, played a meaningful role in her termination.[10]

Additionally, the factual premise underlying Plaintiff's arguments—namely, that Waters was her supervisor and "was actually put in charge of Plaintiff's day to day activities by Defendants"—is simply not supported by the record here. Whatever the precise legal theory Plaintiff is attempting to rely on, there is insufficient evidence, as a factual matter, for a reasonable jury to find that AMR ceded supervisory authority to Waters to an extent that could potentially render AMR liable for Waters' purported discriminatory intent. The background section of this opinion sets out in detail the evidence concerning the actions and statements of Waters and Smith on this issue. Mai and her children were the customers/clients of AMR, and Waters was acting on Mai's behalf. Waters was not ceded supervisory authority, and certainly did not act as a supervisor to a degree that might render AMR liable for her allegedly discriminatory actions.

As Waters' alleged discriminatory intent cannot be imputed to AMR, Plaintiff's race discrimination fails.

---

[10]  In addressing her retaliation claim, Plaintiff's brief asserts, in passing, that "Congress directed federal courts to interpret Title VII based on agency principles," citing the Supreme Court's decision in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). (Pl. Mem. at 11.) This cursory argument is not even advanced in the context of Plaintiff's race discrimination claim and, in any event, Plaintiff has not offered sufficient evidence on this point or articulated a viable theory as to why Waters was AMR's agent. *See Armstrong*, 897 F.3d at 1290–91.

Plaintiff's discrimination claim also fails because the evidence shows that Smith terminated Plaintiff for improperly administering the new mediation to Mai in violation of AMR's policies. After Plaintiff informed Smith that she had been following Giunta's instructions, Smith spoke to both Giunta and Annette—their stories were consistent and contradicted Plaintiff's narrative. Smith has never asserted that she terminated Plaintiff because of Waters' request and a reasonable jury could not find, given the undisputed facts in the record, that Smith's proffered reason for Plaintiff's termination was a pretext. As such, even if Waters harbored a discriminatory intent and there was some avenue to potentially impute that intent to AMR based on Water's alleged supervision of Plaintiff, Plaintiff's Cat's Paw claim would still fail.

Plaintiff's discrimination claim is also undermined by the fact that Smith told Plaintiff on the August 2 phone that she would have to let her go because she violated AMR's policies concerning medication and there is no evidence in the record that Smith made this statement after Plaintiff informed Smith of Waters' racial slur. Why would Smith—who Plaintiff admits harbored no discriminatory animus and was not even aware, at this point, of Waters' racial slur—lie to Plaintiff about the reason for Plaintiff's impending termination? If Smith was terminating Plaintiff based on Waters' request in her August 1 email that Plaintiff be removed from Mai's care, Smith would have had no reason, at that point, to hide that fact.

Given all the facts above, a reasonable jury could not find that Smith terminated Plaintiff based on Waters' request that Plaintiff no longer care for Mai.

Because a reasonable jury could not find that Waters played a meaningful role in Plaintiff's termination, Plaintiff's Cat's Paw claim also fails on this additional ground.

## C. <u>The Retaliation Claim</u>

Title VII prohibits retaliation against employees who engage in protected activity, including complaining about discrimination.   42 U.S.C. § 2000e-3(a). Retaliation claims are analyzed under the essentially same burden-shifting framework as Plaintiff's discrimination claims. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015).  To establish a prima facie case of retaliation, plaintiff must demonstrate: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001)).  A plaintiff can establish a causal connection either: "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant.'" *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "After the defendant responds with a non-retaliatory reason for the adverse employment action, the plaintiff must prove "that the desire to retaliate was the but-

for cause of the challenged employment action." *Ya-Chen Chen*, 805 F.3d at 70 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)).

Plaintiff's brief asserts that "[l]ike Plaintiff's claim of discrimination, her retaliation claim comes about due to the interference of Kathy Waters." (Pl. Mem. at 10.) This argument fails on multiple grounds. First, for the reasons set out in the discussion of Plaintiff's discrimination claim, there is no basis to impute Water's alleged retaliatory animus to AMR or to hold AMR liable for retaliatory actions by Waters. Second, Plaintiff's argument based on Waters' purported retaliatory "interference" also fails because there is no evidence that Waters was even aware of Plaintiff's protected activity, which, according to Plaintiff, was her complaint to Smith on August 2. (Pl. Mem. at 10.) Additionally, the notion that Waters retaliated against Plaintiff for her complaint to Smith makes no sense because Waters' email to Smith—which requested that Plaintiff no longer care for Mai—was sent on August 1, 2017, *before* Plaintiff complained to Smith the next day. Given the facts set out above, Plaintiff cannot establish: (1) that Waters sought to have Plaintiff terminated because of her protected activity; or (2) that AMR could be held liable for any alleged retaliatory actions by Waters.

In her opposition brief, Plaintiff's only argument about retaliation is premised on Waters' alleged involvement in her termination. Accordingly, Plaintiff has waived any argument that Smith or any other AMR employee intended to retaliate against Plaintiff for engaging in protected activity. In any event, such arguments would not succeed. When Plaintiff and Smith spoke on August 2, Smith told Plaintiff that she

was going to be terminated. There is no evidence in the record that Plaintiff complained about Waters' racial slur *before* this statement by Smith. Additionally, as noted above, Waters had requested that Plaintiff be removed from Mai's case *before* the August 2 phone call between Smith and Plaintiff, which further undercuts any retaliation claim.

Finally, a reasonable jury could not ultimately find that Smith's proffered reason for Plaintiff's termination was a pretext for retaliation. As explained earlier in the discussion of Plaintiff's discrimination claim, once Plaintiff informed Smith on the August 2 phone call that she had acted in accordance with Giunta's directions, Smith investigated Plaintiff's allegation and spoke to both Giunta and Annette. Their stories were consistent and contradicted Plaintiff's version of events. Given those undisputed facts, Plaintiff cannot establish that Smith's proffered reason for her termination was a pretext for retaliation.

Because Plaintiff's retaliation claim fails on the multiple grounds set out above, the Court does not reach Defendants' argument that Plaintiff did not actually engage in protected activity.[11]

---

[11] The Court has assumed *arguendo* that Plaintiff's complaint to Smith qualifies as protected activity. However, given the Court's determination that there is no basis to impute any discriminatory or retaliatory conduct by Waters to AMR, there is a question whether Plaintiff's complaint about Waters' comment even qualifies as protected activity. "To succeed on a retaliation claim, the plaintiff must at least have a good-faith, reasonable belief that she was opposing an unlawful employment practice." *Leroy v. Delta Air Lines*, No. 21-267-CV, 2022 WL 12144507, at *1 (2d Cir. Oct. 27, 2022) (finding that Plaintiff's complaint to employer that customer called her a "black bitch" did not constitute protected activity). Here, it is unnecessary for the Court to resolve the question of whether Plaintiff's complaint to Smith qualifies as protected activity.

**D.  State Law Claims**

Having dismissed all of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and dismisses those claims without prejudice.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998).

## III.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted on Plaintiff's Title VII claims, which are dismissed with prejudice.  Plaintiff's state law claims are dismissed without prejudice.  The Clerk of Court is directed to enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York                         /s/ Joan M. Azrack
      September 11, 2023                         Joan M. Azrack
                                       United States District Judge